**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

7 MERRIEWOLD LLC

        Debtor.

-------------------------------------------------------------x

Chapter 11

Case No. 26-35163 (KYP)

**MEMORANDUM DECISION GRANTING U.S. BANK'S MOTIONS FOR**
**(I) ANNULMENT OF THE AUTOMATIC STAY, AND**
**(II) DISMISSAL OF THE BANKRUPTCY CASE**

**APPEARANCES:**

BRONSON LAW OFFICES, P.C.
*Counsel to Debtor*
480 Mamaroneck Avenue
Harrison, New York 10528
By:    H. Bruce Bronson, Jr., Esq.
        Carl J. Nelson, Esq.
           Of Counsel

ALDRIDGE PITE, LLP
40 Marcus Drive
Suite 200
Melville, New York 11747
By:    Jenelle Arnold, Esq.
           Of Counsel

**HONORABLE KYU YOUNG PAEK**
**UNITED STATES BANKRUPTCY JUDGE**

**INTRODUCTION**

Mortgage lender U.S. Bank Trust National Association, as Trustee for RCF 2

Acquisition Trust ("U.S. Bank") has moved for (i) annulment of the automatic stay

("Motion to Annul Stay")[1] to validate a foreclosure auction and sale of real property

located at 7 Merriewold Lane South, Monroe, NY 10905 ("Property"), and (ii) dismissal

of this bankruptcy case ("Motion to Dismiss," and together with the Motion to Annul

Stay, the "Motions").[2]  The Debtor objects to the Motion to Annul Stay.[3]  For the reasons

stated, (i) the Motion to Annul Stay is GRANTED, and as part of that decision, the Court

concludes that the United States Supreme Court decision in *Roman Cath. Archdiocese*

*of San Juan, Puerto Rico v. Acevedo Feliciano*, 589 U.S. 57 (2020) ("*Acevedo*") did not

divest this Court of its authority to annul the automatic stay, and (ii) the Motion to

Dismiss is GRANTED.

### <u>JURISDICTION</u>

This Court has jurisdiction over the Motions pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* (M-431), dated January 31, 2012

(Preska, C.J.) referring bankruptcy cases and proceedings to the Bankruptcy Judges of

the Southern District of New York.  The Motions are core proceedings under 28 U.S.C.

§ 157(b)(2)(A), (G), and (O).

---

[1]     *See Motion for [Annulment] of the Automatic Stay Nunc Pro Tunc*, dated Apr. 7, 2026 ("U.S.
Bank Stay Brief") (ECF Doc. # 11).  "ECF Doc. # _" refers to documents filed on the electronic docket of
this bankruptcy case.  References to the docket of other cases will include the case name or number.  "ECF
p. _" refers to the page number imprinted across the top of the page by the Court's e-filing system.

[2]     *See Motion to Dismiss Debtor's Chapter 11 Bankruptcy*, dated Apr. 7, 2026 ("U.S. Bank Dismissal
Brief") (ECF Doc. # 10).

[3]     *See Objection of Debtor to Motion for Annulment of the Automatic Stay Nunc Pro Tunc*, dated
May 15, 2026 ("Debtor Brief") (ECF Doc. # 14).

## **BACKGROUND**[4]

### **A.     The Mortgage and the Foreclosure Judgment**

On January 25, 2019, Bentzion Jacobovitch ("Borrower") borrowed $330,600.00 to finance the purchase of the Property from FM Home Loans, LLC by executing a note and mortgage granting a security interest to the lender in the Property ("Mortgage").[5] On January 13, 2023, the Mortgage was assigned to Federal National Mortgage Association, and, on March 16, 2023, the Mortgage was further assigned to U.S. Bank.[6]

On May 25, 2023, U.S. Bank commenced an action in the Supreme Court of the State of New York, County of Orange ("State Court"), against the Borrower and others to foreclose on the Property.  *See U.S. Bank Trust National Association, not in its Individual Capacity but Solely as Owner Trustee for RCF 2 Acquisition Trust v. Bentzion Jacobovitch, et al.*, Index No. EF003409-2023 ("State Court Action").  On October 3, 2024, the State Court entered an *Order Confirming Referee Report and Judgment of Foreclosure and Sale* ("Foreclosure Judgment"), which, among other things, directed the court-appointed referee ("Referee") to conduct a foreclosure auction and sale of the Property.[7]

---

[4]     This section includes references to judicial documents and court records filed on dockets of other cases.  The Court may take judicial notice of such documents and records.  *In re Mirena IUD Prods. Liab. Litig.*, 29 F. Supp. 3d 345, 350 (S.D.N.Y. 2014); *see* FED. R. EVID. 201.

[5]     Copies of the note and Mortgage are attached as Exhibits 1 and 2 to the U.S. Bank Stay Brief.

[6]     Documents evidencing the Mortgage assignments are included in Exhibit 2 to the U.S. Bank Stay Brief at ECF pp. 13-19.

[7]     A copy of the Foreclosure Judgment is attached as Exhibit 3 to the U.S. Bank Stay Brief.

3

**B.      The Previously Scheduled Auctions and the Involuntary Petitions**

Consistent with the Foreclosure Judgment, the Referee scheduled a foreclosure auction of the Property for May 7, 2025 ("First Foreclosure Auction"). (*See Notice of Sale*, docketed on Apr. 4, 2025 (ECF State Court Action Doc. # 82).)  However, two days prior to the First Foreclosure Auction, an individual named Devries Shaye ("Shaye") filed an involuntary Chapter 7 bankruptcy petition against the Borrower.  *See In re Bentzion Jacobovitch*, Case No. 25-35481 (KYP) ("First Involuntary Case").  The filing of the First Involuntary Case had the effect of canceling the First Foreclosure Auction by operation of the Bankruptcy Code's automatic stay.  *See* 11 U.S.C. § 362(a) (providing that the automatic stay applies to "a petition filed under section . . . 303 . . . ."); *see also* 11 U.S.C. § 303 (section governing involuntary bankruptcy cases).  Shaye failed to prosecute the First Involuntary Case, and the case was dismissed on July 25, 2025 for failure to pay the filing fee associated with involuntary bankruptcy petitions.  (ECF First Involuntary Case Doc. # 7.)

Following dismissal of the First Involuntary Case, the Referee scheduled another foreclosure auction of the Property for September 24, 2025 ("Second Foreclosure Auction").  (*See Notice of Sale*, docketed on Aug. 22, 2025 (ECF State Court Action Doc. # 86).)  However, one day prior to the Second Foreclosure Auction, Shaye filed a second involuntary Chapter 7 bankruptcy petition against the Borrower.  *See In re Bentzion Jacobovitch*, Case No. 25-36006 (KYP) ("Second Involuntary Case").  The filing of the Second Involuntary Case had the effect of canceling the Second Foreclosure Auction by operation of the automatic stay (*see* prior paragraph).  Shaye failed to prosecute the Second Involuntary Case, and the case was dismissed on October 22, 2025 for failure to

pay the filing fee associated with involuntary bankruptcy petitions.  (ECF Second

Involuntary Case Doc. # 6.)

As part of its consideration of the instant Motions, this Court entered an order on

June 3, 2026 authorizing Shaye to submit an affidavit explaining why he commenced,

but failed to prosecute, the First and Second Involuntary Cases ("Order Authorizing

Shaye Affidavit").  (ECF Doc. # 24.)[8]  Shaye failed to submit an affidavit by the deadline

set forth in the Order Authorizing Shaye Affidavit.

## C.      Events Leading Up to, and Which Occurred on, February 17, 2026

Following dismissal of Second Involuntary Case, the Referee scheduled yet

another foreclosure auction for February 17, 2026 ("Third Foreclosure Auction").  (*See

Notice of Sale*, docketed on Jan. 16, 2026 ("Third Notice of Sale") (ECF State Court

Action Doc. # 89).)  One day prior to the Third Foreclosure Auction, the Borrower

created an entity called 7 Merriewold LLC ("Debtor")[9] and designated himself as the sole

member of the Debtor.[10]  On the same day, the Borrower executed a *Bargain and Sale

Deed With Covenant Against Grantor's Acts*, under which the Borrower conveyed the

Property to the Debtor in exchange for $10.00 ("Deed of Conveyance").[11]

---

[8]      Shaye listed two different email addresses in his involuntary bankruptcy petitions, and there was
a typographical error on his mailing address listed on the second involuntary petition.  The Court emailed
a copy of the Order Authorizing Shaye Affidavit to both email addresses and mailed a copy to the correct
mailing address.  (*See* Order Authorizing Shaye Affidavit at 3 and 3 n.1; *see also* ECF Doc. ## 25, 26
(certificates of service).)

[9]      *See* Entity search results for "7 Merriewold LLC," NY DEP'T OF STATE,
https://apps.dos.ny.gov/publicInquiry/#search (showing that the Debtor was created on February 16,
2026) (last visited on June 14, 2026).  The Court may take judicial notice of records maintained by the
New York Department of State.  *CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 378-
88 (2d Cir. 2025) (citation omitted).

[10]     *See Written Consent and Resolution of the Members / Managers of 7 Merriewold LLC*, dated
Feb. 16. 2026 (ECF Doc. # 1 at ECF pp. 5-6).

[11]     The Deed of Conveyance is attached as Exhibit 9 to the U.S. Bank Stay Brief.

The next day – February 17, 2026 ("Petition Date") – the following sequence of

events occurred:

- **8:54 a.m.** – Debtor's Chapter 11 bankruptcy petition was filed (*see* ECF Doc. # 1 (Debtor's Chapter 11 petition with the Court's timestamp));

- **9:06 a.m.**[12] – a third-party named Eddie Doran emailed ("Doran Email")[13] a photo of the Notice of Bankruptcy Case Filing ("Notice of Bankruptcy") to (i) the Referee, and (ii) a generic customer service email address for U.S. Bank's bankruptcy counsel;[14] (*see* ECF Doc. # 11-6);

- **9:48 a.m.** – Deed of Conveyance was recorded with the Orange County Clerk (*see* ECF Doc. # 11-9 at ECF p. 1 (receipt from county clerk));

- **10:00 a.m.** – Third Foreclosure Auction occurred (*see* Third Notice of Sale); and

- **10:15 a.m.** – Copy of the Notice of Bankruptcy was filed in the State Court Action (*see* ECF State Court Action Doc. # 91).

D.      **The Debtor's Bankruptcy Case and the Instant Motions**

The Debtor has made zero progress in this bankruptcy case since filing its

barebones Chapter 11 petition on the Petition Date.  The Clerk's Office noted on the

docket the following deficiencies and deadlines to cure those deficiencies:

- Schedule A/B due 3/3/2026;

- Schedule D due 3/3/2026;

- Schedule E/F due 3/3/2026;

- Schedule G due 3/3/2026;

- Schedule H due 3/3/2026;

---

12      The time reflected on the email was actually "8:06 a.m.," but the Court assumes the sender's email account was not set for the eastern-time zone because the email attached the Notice of Bankruptcy which had a notation that the bankruptcy petition was electronically docketed at 9:04 a.m. (ET).  Thus, Mr. Doran's email must have been sent after 9:04 a.m. (ET).  The Court assumes it was sent at 9:06 a.m. (ET) because the sender likely wanted to provide notice in advance of the 10:00 a.m. foreclosure auction. Moreover, the fact that the Notice of Bankruptcy was sent as a photo (rather than a scanned or pdf copy) suggests that the sender was emailing the notice with haste.

13      The record does not reflect any connection between Mr. Doran and any of the parties.

14      The firm's generic email address was customerservice@aldridgepite.com.

- Summary of Assets and Liabilities due 3/3/2026;

- Statement of Financial Affairs due 3/3/2026;

- Declaration of Schedules due 3/3/2026;

- List of Equity Security Holders due 3/3/2026;

- Local Rule 1007-2 Affidavit due by: 3/3/2026;

- Corporate Ownership Statement due by: 3/3/2026;

- Chapter 11 Plan due by 6/17/2026; and

- Disclosure Statement due by 6/17/2026.

To date, *none* of these deficiencies have been remedied.

On April 7, 2026, U.S. Bank filed the (i) Motion to Annul Stay seeking, *inter alia*, to retroactively validate the Third Foreclosure Auction, and (ii) Motion to Dismiss seeking dismissal of the Debtor's bankruptcy case.  (*See* U.S. Bank Stay Brief and U.S. Bank Dismissal Brief.)  The Debtor filed an opposition to the Motion to Annul Stay on May 15, 2026.  (*See* Debtor Brief.)  The Court heard oral argument on May 19, 2026 and took the matters under advisement.[15]

<strong><u>DISCUSSION</u></strong>

**A.     Motion to Annul Stay**

**1.     Standards Governing Annulment of Automatic Stay**

Under section 362(a)(1) of the Bankruptcy Code, the filing of a bankruptcy petition "triggers an automatic stay which protects the debtor from enforcement of pre-petition judgments obtained against the debtor or against property of the estate."  *In re Jean-Francois*, 516 B.R. 699, 703 (E.D.N.Y. 2014) (quoting *In re Bresler*, 119 B.R. 400,

---

[15]     At the hearing, the Court allowed the parties to try one final meet and confer to see if a consensual resolution could be reached.  On May 22, 2026, counsel to each party submitted a letter reporting that the parties were unable to reach an agreement.  (ECF Doc. ## 19, 20.)

402 (Bankr. E.D.N.Y. 1990)) (alteration omitted). "The stay is effective immediately upon the filing of the petition, and any proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994) (citations omitted).

Nonetheless, section 362(d) of the Bankruptcy Code allows a party to seek relief from the automatic stay including "by . . . annulling . . . such stay . . . ." 11 U.S.C. § 362(d). The annulment of the stay "grants retroactive relief, thereby validating past proceedings or actions that would otherwise be deemed void." *Jean-Francois*, 516 B.R. at 704 (citation and internal quotation marks omitted). To determine whether annulment of the stay is appropriate, courts in the Second Circuit analyze the following factors originally set forth in *In re Stockwell*, 262 B.R. 275, 281 (Bankr. D. Vt. 2001):

1. If the creditor had actual or constructive knowledge of the bankruptcy filing and, therefore, of the stay;

2. If the debtor has acted in bad faith;

3. If there was equity in the property of the estate;

4. If the property was necessary for an effective reorganization;

5. If grounds for relief from the stay existed and a motion, if filed, would likely have been granted prior to the automatic stay violation;

6. If failure to grant retroactive relief would cause unnecessary expense to the creditor; and

7. If the creditor has detrimentally changed its position on the basis of the action taken.

*Garcia v. Sklar* (*In re Sklar*), 626 B.R. 750, 763 (Bankr. S.D.N.Y. 2021) (quoting the *Stockwell* factors). "[N]ot every *Stockwell* factor must be met in order for the bankruptcy court to annul the stay." *Jean-Francois*, 516 B.R. at 706.

8

Annulment of the stay is a form of relief that "should be granted sparingly."

*Sklar*, 626 B.R. at 763 (quoting *Chimera Cap., L.P. v. Nisselson* (*In re MarketXT*), 428

B.R. 579, 585 (S.D.N.Y. 2010)).  "If retroactive relief becomes commonplace, creditors –

anticipating *post facto* validation – will be tempted to pursue claims against bankrupts

heedless of the stay, leaving debtors with no choice but to defend for fear that post-

petition default judgments routinely may be resuscitated."  *Id.* (quoting *Soares v.

Brockton Credit Union* (*In re Soares*), 107 F.3d 969, 977 (1st Cir. 1997)).

**2.    Analysis**

Here, a majority of the *Stockwell* factors favor annulment of the stay.  As to the

first *Stockwell* factor, U.S. Bank had neither actual nor constructive notice that the

automatic stay enjoined the Third Foreclosure Auction.  The Doran Email, containing a

photo of the Notice of Bankruptcy, was sent to a generic customer service email address

maintained by U.S. Bank's bankruptcy counsel a mere 54 minutes before the start of the

Third Foreclosure Auction.  It is unknown how often this generic email address is

checked and unrealistic to assume that such email would be reviewed and forwarded to

the specific attorneys assigned to the State Court Action within 54 minutes of receipt.

Even if the correct U.S. Bank attorneys received a copy of the Notice of

Bankruptcy before the Third Foreclosure Auction, it still would not have provided

adequate notice that the automatic stay enjoined the auction.  The Notice of Bankruptcy

referred to the bankruptcy filing of the *Debtor*, and not the *Borrower*.  At the time of the

Third Foreclosure Auction, U.S. Bank had no reason to know that the Borrower had

transferred the Property to the Debtor.  The Debtor was a stranger to U.S. Bank, and

notice of the Debtor's bankruptcy would not have given U.S. Bank adequate notice of

anything.

9

As to the second *Stockwell* factor, the Court finds that the Debtor – through its sole member, the Borrower – filed this case in bad faith.  The Second Circuit has set forth the following factors that are indicative of bad faith:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*C-TC 9th Ave. P'ship v. Norton Co.* (*In re C-TC Ave. P'ship*), 113 F.3d 1304, 1311 (2d Cir. 1997).  Most of the bad faith factors are present here.  The Property is the Debtor's only asset, U.S. Bank is its only creditor, the Debtor's finances represent a two-party dispute, the Property is subject to the Foreclosure Judgment, and the Debtor has no operations, cash flow or employees.  Most notably, the following actions clearly show that the Debtor acted with intent to delay and frustrate U.S. Bank's legitimate rights under the Foreclosure Judgment:

- the Borrower's formation of the Debtor one day before the Third Foreclosure Auction;

- the Borrower's transfer of the Property to the Debtor one day before the Third Foreclosure Auction in exchange for $10.00; and

- the filing of the Debtor's bankruptcy petition roughly one hour prior to the Third Foreclosure Auction.

The Court also finds that the Debtor's efforts to stop the Third Foreclosure Auction were a continuation of the Borrower's prior efforts to delay and frustrate U.S. Bank's rights.  As stated above, the First and Second Foreclosure Auctions were canceled

by the filing of the First and Second Involuntary Cases against the Borrower by petitioning creditor Shaye on the eve of those auctions. When this Court invited Shaye to submit an affidavit explaining the circumstances surrounding his filing of the involuntary cases, Shaye failed to respond. Based on Shaye's silence, the timing of the involuntary cases, and the utter lack of prosecution of those cases, the only conclusion the Court can draw is that Shaye filed the involuntary cases, in concert with the Borrower, to frustrate U.S. Bank's right to proceed with its previously scheduled foreclosure auctions. *See In re Grossinger*, 268 B.R. 386, 387 (Bankr. S.D.N.Y. 2001) ("The potential for collusive filing exists where a 'friendly' creditor files an involuntary petition with no intention of serving the debtor or seeking an order for relief but with the intent of frustrating the rights of a secured creditor or any other creditor whose state court remedies are stayed until the case is closed.").

As to the fourth *Stockwell* factor,[16] the Court notes that, although the Property would be necessary for a reorganization, the Debtor is not prosecuting this bankruptcy case. Indeed, as stated above, the Debtor has not even filed basic bankruptcy schedules, let alone a disclosure statement or plan of reorganization. This factor weighs in favor of annulling the stay because there is no prospect of a successful reorganization. *Jean-Francois*, 516 B.R. at 706 (where the debtor "has not taken any steps . . . to reorganize and create a repayment plan . . . the property could not possibly be necessary for reorganization.").

---

[16] The record does not include information about the price at which the Property was sold in the Third Foreclosure Auction. Thus, the Court cannot analyze the third *Stockwell* factor, *i.e.*, whether there is equity in the Property.

As to the fifth *Stockwell* factor, the Court finds that a hypothetical motion for relief from the automatic stay would have been granted prior to the Third Foreclosure Auction.  A debtor's bad faith in filing a bankruptcy petition can constitute "cause" warranting relief from the automatic stay under 11 U.S.C. § 362(d)(1).  *Holt v. JP Morgan Chase Bank, N.A.*, 17-CV-07901 (NSR), 2019 WL 192298, at *1 (S.D.N.Y. Jan. 15, 2019); *In re Chalek*, 667 B.R. 76, 81 (Bankr. S.D.N.Y. 2025).  As set forth *supra* in the second *Stockwell* factor discussion, the Debtor filed this bankruptcy in bad faith.  Therefore, the Court would have granted U.S. Bank's timely motion for relief from the automatic stay on bad faith grounds.

As to the sixth *Stockwell* factor, the Court finds that U.S Bank would incur unnecessary expense absent annulment of the stay.  In an analogous case, the District Court in *Jean-Francois* observed that the failure to grant retroactive relief "would cause unnecessary expense to the creditor, not only in advertising and auction fees, but also in losing its good faith purchaser and possibly having to sell the property for a lesser value at a later date."  516 B.R. at 706.  The same rationale applies here.  The Third Foreclosure Auction resulted in the sale of the Property, and absent annulment of the stay, U.S. Bank would incur additional costs associated with a fourth foreclosure auction as well as the prospect of selling the Property for a price that is lower than the price to be paid by the winning bidder of the Third Foreclosure Auction.

In summary, five of the seven *Stockwell* factors strongly support annulment of the stay.  Under these circumstances, annulment of the stay is appropriate.

### 3.      Effect of *Acevedo* on the Motion to Annul Stay

After oral argument on the Motions, counsel for each party submitted a letter informing the Court that no post-hearing settlement was reached.  (*See supra* note 15.)

12

The Debtor's letter (ECF Doc. # 19), however, included legal arguments which were not included in the Debtor Brief. The Court only permitted the submission of letters to advise the Court about the results of post-hearing negotiations, not to present new legal arguments. Thus, the legal arguments contained in the Debtor's letter were unauthorized and do not merit consideration. *Preston Hollow Cap. LLC v. Nuveen Asset Mgmt. LLC*, 343 F.R.D. 460, 465 (S.D.N.Y. 2023) ("It is well-settled that sur-replies are not permitted without court authorization."). The Court will, however, address one issue raised in the Debtor's letter because it goes to this Court's authority to annul the stay after the Supreme Court's 2020 decision in *Acevedo*.

In *Acevedo*, active and retired employees of certain Catholic schools in Puerto Rico alleged that the trust created to administer their pension plan ("Trust") had improperly terminated such plan and filed suit ("Pension Case") in the Puerto Rico Court of First Instance ("Puerto Rico Trial Court") against (i) the Roman Catholic and Apostolic Church of Puerto Rico ("Church"), (ii) the Archdiocese of San Juan ("Archdiocese"), (iii) the Trust, (iv) the Office of the Superintendent who created the Trust, and (v) the schools. *Acevedo*, 589 U.S. at 58-59. After an initial round of appeals in the Puerto Rico court system on the entry of a preliminary injunction, the Puerto Rico Trial Court entered orders on March 16, 26, and 27, 2018 requiring the Church to make pension payments to the plaintiffs ("Payment Orders"). *Id*. at 60, 63.

Roughly two months prior to the entry of the Payment Orders, the Trust filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Puerto Rico. *See In re Cath. Sch. Emps. Pension Tr.*, Case No. 18-00108-ESL11 (Bankr. D. P.R.) On February 6, 2018, the Archdiocese removed the Pension Case to the United States District Court for the District of Puerto Rico ("Puerto Rico Federal Court")

13

arguing that the Pension Case was sufficiently related to the Trust's bankruptcy to confer federal jurisdiction. *Acevedo*, 589 U.S. at 63. On March 13, 2018, the Trust's bankruptcy case was dismissed. *Id*. Even though the basis for removal of the Pension Case was eliminated by the dismissal of the Trust's bankruptcy case, the Puerto Rico Federal Court did not enter an order remanding the Pension Case back to the Puerto Rico Trial Court until August 20, 2018 ("Remand Order"). *Id*.

The timing of the remand created an issue: the Puerto Rico Trial Court had entered the Payments Orders *after* the Pension Case was removed to Puerto Rico Federal Court in February 2018 but *before* the Puerto Rico Federal Court remanded the Pension Case back to the Puerto Rico Trial Court in August 2018. The Puerto Rico District Court attempted to resolve this issue by stating in its Remand Order that the remand "shall be effective as of March 13, 2018." *Id*. at 64.

On remand, further litigation and a second round of appeals ensued regarding the designation of defendants that should make the payments under the Payment Orders. *Id*. at 60-61. Eventually, the Archdiocese petitioned the United States Supreme Court for a *writ of certiorari* arguing that the courts should defer to the Church's view on that issue. *Id*. at 61-62.

The Supreme Court vacated the Payment Orders and remanded the matter on the basis that the Puerto Rico Trial Court lacked jurisdiction to issue the Payment Orders. *Id*. at 63. Quoting 28 U.S.C. § 1446(d), the Supreme Court explained that once an action is removed to federal court, "the State court shall proceed no further unless and until the case is remanded." *Id*. State court proceedings that occur after removal to federal court "are not simply erroneous, but absolutely void." *Id*. at 63-64 (citation, alterations, and internal quotation marks omitted). The Puerto Rico Trial Court issued the Payment

14

Orders when it lacked jurisdiction over the Pension Case, and therefore, such orders were void. *Id*. at 64.

The Supreme Court then explained why the Remand Order, which provided for retroactive effect of the remand, did not fix the jurisdiction issue:

> Federal courts may issue *nunc pro tunc* orders, or "now for then" orders, to reflect the reality of what has already occurred. Such a decree presupposes a decree allowed, or ordered, but not entered, through inadvertence of the court.
>
> Put colorfully, nunc pro tunc orders are not some Orwellian vehicle for revisionist history – creating 'facts' that never occurred in fact. Put plainly, the court cannot make the record what it is not.

*Id*. at 65 (citations, alterations, and internal quotation marks omitted). On March 13, 2018 – *i.e.*, the backdate written in the Remand Order – the Pension Case remained in the Puerto Rico Federal Court. *Id*. The Puerto Rico Federal Court's *nunc pro tunc* Remand Order may not retroactively grant jurisdiction to the Puerto Rico Trial Court because, on March 13, 2018, the Puerto Rico Trial Court lacked jurisdiction over the Pension Case. *Id*.

Two months after *Acevedo* was issued, one bankruptcy court ruled that bankruptcy courts no longer had authority to annul the automatic stay. *See In re Telles*, Case No. 8-20-70325 (REG), 2020 WL 2121254, at *4-5 (Bankr. E.D.N.Y. Apr. 30, 2020). The *Telles* Court observed that, under *Acevedo*, "*nunc pro tunc* relief cannot be used to confer jurisdiction where none existed." *Telles*, 2020 WL 2121254, at *4. The *Telles* Court then ruled that the bankruptcy court could not annul the stay to validate a post-petition foreclosure sale because "the state court was divested of jurisdiction over" the debtor and the property at issue upon the filing of a bankruptcy petition. *Id*. at *5.

15

The Debtor here relies on the *Telles* decision to assert that this Court may not annul the stay to retroactively validate the Third Foreclosure Auction.

Subsequent decisions have uniformly disagreed with *Telles* and have ruled that *Acevedo* did not alter a bankruptcy court's ability to annul the stay. First and foremost, these decisions point to the plain language of 11 U.S.C. § 362(d), which explicitly authorizes annulment as an option when describing the forms of relief from the automatic stay that a bankruptcy court may grant. *See* 11 U.S.C. § 362(d) (". . . the court shall grant relief from the stay . . . such as by terminating, *annulling*, modifying, or conditioning such stay . . . .") (emphasis added); *In re Patel*, 142 F.4th 1313, 1321 (5th Cir. 2025) ("The phrasing of section 362(d) underscores the broad and flexible power of bankruptcy courts to grant relief. Congress used four verbs . . . . to describe the bankruptcy court's authority to alter automatic stays."); *Merriman v. Fattorini* (*In re Merriman*), 616 B.R. 381, 393 (B.A.P. 9th Cir. 2020) ("To the extent that jurisdiction describes a statutory grant of authority to adjudicate a matter or exercise a power, it is absolutely clear that Congress expressly gave such power, including the power retroactively to grant relief, to bankruptcy courts."), *appeal dismissed*, No. 20-60036, 2021 WL 3610895 (9th Cir. 2021); *Kahn v. Panjwani* (*In re Kahn*), Case No. 20-60032-CIV (AMC), 2021 WL 4865278, at *5 (S.D. Fla. Oct. 19, 2021) ("[Acevedo] is different from this case for the following foundational reason: the text of the Bankruptcy Code itself gives Bankruptcy Judges the power not only to 'terminate' but also to 'annul' the automatic stay."); *In re Okorie*, Case No. 19-50379 (KMS), 2024 WL 559083, at *7 (Bankr. S.D. Miss. Feb. 12, 2024) ("The Bankruptcy Code expressly authorizes annulment as one form of relief from the stay . . . .), *aff'd sub nom. Okorie v. Lentz* (*In re Okorie*), Civil Action No. 2:24-cv-20-HSO-BWR, 2024 WL 3568604 (S.D. Miss. July 19,

16

2024), *aff'd*, No. 24-60377, 2025 WL 603890 (5th Cir. Feb. 25, 2025).  Relatedly, Congress designated motions to annul the automatic stay as core proceedings for which a bankruptcy court may enter final orders.  28 U.S.C. § 157(b)(2)(G).

Second, *Acevedo* concerned the effect of removal to federal court under 28 U.S.C. § 1446(d), under which state courts lose all jurisdiction over the case, and any post-removal action of the state court is void.  In contrast, 11 U.S.C. § 362(d) empowers bankruptcy courts "to modify or annul a stay and permit another court or entity to exercise control over an asset or claim."  *Patel*, 142 F.4th at 1321.  "Section 1446 . . . grants district courts no such power in actions removed from state court."  *Id.*

Third, the jurisdictional concerns that were the focus of *Acevedo* "play no role" in the context of stay annulments.  *Id.*  While acts in violation of the automatic stay are void, they are "not void for want of jurisdiction . . . ."  *Id.*  In fact, under 28 U.S.C. § 1334(b), "state and federal courts have concurrent jurisdiction over civil proceedings" arising under the Bankruptcy Code, or arising in or related to bankruptcy cases.  *Id.* "The annulment did not retroactively grant jurisdiction where there was none; it eliminated an impediment to the enforcement" of rights obtained by the creditor in a non-bankruptcy forum.  *Id.* (quoting *Merriman*, 616 B.R. at 394) (alteration and internal quotation marks omitted).

This Court is persuaded by the majority view.  *Acevedo* did not remove a bankruptcy court's statutory right to annul the stay under 11 U.S.C. § 362(d) and 28 U.S.C. § 157(b)(2)(G).  The jurisdictional issues discussed in *Acevedo* play no role in a bankruptcy court's decision to grant relief from the automatic stay because, unlike 28 U.S.C. § 1446(d) under which the state court loses jurisdiction to perform any act, 11 U.S.C. § 362(d) expressly permits a bankruptcy court to empower another court – often,

17

a state court – to exercise control over estate property.  Thus, *Acevedo* presents no impediment to this Court's annulment of the stay to retroactively validate the Third Foreclosure Auction.

**B.      Motion to Dismiss**

Dismissal of a Chapter 11 case is governed by 11 U.S.C. § 1112(b), which provides that the Court shall convert a Chapter 11 case "to a case under chapter 7 or dismiss a case, whichever is in the best interest of creditors and the estate, for cause . . . ." Examples of "cause" are set forth in section 1112(b)(4)(A) – (P), but a debtor's bad faith may also constitute "cause" for dismissal under section 1112(b).  *In re Syndicom Corp.*, 268 B.R. 26, 48 (Bankr. S.D.N.Y. 2001).  Here, in its analysis of the *Stockwell* factors, the Court has already concluded that the Debtor filed this bankruptcy in bad faith.  For the same reasons, the Court finds that "cause" exists to dismiss this case.

## CONCLUSION

For the reasons set forth herein, the Motion to Annul Stay is GRANTED, and the results of the Third Foreclosure Auction are hereby VALIDATED.  The Motion to Dismiss is also GRANTED.  Counsel to U.S. Bank is directed to submit proposed orders consistent with this Memorandum Decision via the Court's eOrders system.

/s/ Kyu Y. Paek

**Dated: June 22, 2026**
**Poughkeepsie, New York**

_____
**Hon. Kyu Y. Paek**
**U.S. Bankruptcy Judge**

18